157 F.3d 465
 Ronald W. TESCH, Plaintiff-Appellant,
v.
COUNTY OF GREEN LAKE, Don Bruendl, Sheriff of Green Lake
County, County of Outagamie, Bradley G. Gehring, Sheriff of
Outagamie County, John L. Behrent, Mary E. Effertz, Certain
Unnamed Deputy Sheriffs and/or Correctional Officers
Employed by Outagamie County, City of Berlin, John
Trochinski, David Trochinski, Robert W. Zache, and John W.
Dobson, Defendants-Appellees.
 No. 97-3930.
 United States Court of Appeals,
Seventh Circuit.
 Submitted May 22, 1998*.
Decided Sept. 8, 1998.
 
 Richard J. Auerbach (submitted on briefs), Auerbach & Porter, Madison, WI, for Plaintiff-Appellant.
 Peter M. Farb (submitted on briefs), Gabert, Williams & Farb, Appleton, WI, for County of Outagamie and Gehring.
 Gregg T. Heidenreich, Stilp & Cotton, Milwaukee, WI, for City of Berlin.
 Before FLAUM, RIPPLE, and KANNE, Circuit Judges.
 KANNE, Circuit Judge.
 
 
 1
 Ronald Tesch, who suffers from muscular dystrophy and is confined to a wheelchair, brought this action pursuant to 42 U.S.C. § 1983 alleging that police and correctional officers failed to deal with his affliction during his arrest and pre-trial detention. Tesch claims that the City of Berlin, Wisconsin and some of its police officers violated § 1983 by ordering him to get into a police car when he was physically unable to do so and then failing to heed his instructions on how to lift him off the ground after he fell in his attempt to comply with their orders. Tesch also claims that Outagamie County, Wisconsin and some of its sheriff deputies and correctional officers violated § 1983 by holding him for two nights in a jail cell that did not meet his particular basic human needs. The district court granted summary judgment to all of the defendants. We affirm.
 
 I. HISTORY
 
 2
 We take as true that muscular dystrophy prevents Tesch from walking; he uses a wheelchair or motorized scooter for assistance. On November 13, 1992, police officers from the City of Berlin arrested Tesch and his wife, Sandy Tesch. Following his arrest, officers took Tesch to the Green Lake County Jail, then a local hospital, and finally to the Outagamie County Jail where he remained until his initial appearance on November 16, 1992.
 
 A.
 
 3
 Prior to the arrest of Tesch on charges relating to pornography (which were later dismissed), Sergeant John Trochinski and Officers David Trochinski and Robert Zache of the City of Berlin Police Department met to discuss Tesch's physical condition. At that meeting, they learned that Tesch was disabled and could not walk but that he could stand for short periods of time through the use of crutches, canes, or by leaning on nearby objects. The officers did not know the cause of Tesch's disability. They agreed that because of Tesch's disability, they would not follow their normal procedure of handcuffing the arrestee. They also decided that Tesch could ride in either the front or back of the squad card, whichever was more comfortable for him.
 
 
 4
 When the City of Berlin officers arrived to make the arrest, Tesch was seated in his motorized scooter just outside his residence. Sergeant Trochinski, the officer in charge, approached Tesch and informed him that he was under arrest. Tesch requested his "handicapped rights." Sergeant Trochinski told him that the officers would transport Tesch and his manually-operated wheelchair to the Green Lake County Jail, and an officer placed the wheelchair in the trunk of a squad car parked near the residence.
 
 
 5
 Sergeant Trochinski ordered Tesch to drive his scooter to the squad car. After Tesch maneuvered his scooter as close to the open front passenger door as possible, he asked Officers Trochinski and Zache how he was supposed to get in the car. According to Tesch, he was told to get up and into the car. Tesch responded that he could not get in by himself and that he needed assistance. Sandy Tesch also told the officers that he needed help; she could not help because she was already under arrest and in the squad car. Neither Officer Trochinski nor Zache offered assistance. Instead, they told Tesch to get into the squad car.
 
 
 6
 Tesch, after lifting the left arm of his scooter, fell into the small space between the scooter and the car, twisting his torso in the process. Officers Trochinski and Zache stated in depositions that when Tesch attempted to transfer himself into the squad car, he grabbed the top of the open squad car door, pulled himself up to a standing position, and then sat on the ground. According to Tesch, he has never attempted to enter a vehicle in this manner and does not believe that he was physically capable of doing so.
 
 
 7
 As a result of the fall, Tesch stated that he was in considerable pain. Officers Trochinski and Zache assisted Tesch by lifting him under his arms and placing him in the squad car. Sandy Tesch asked the officers not to pick Tesch up without direction, and Tesch also remembers saying something about not picking him up in that manner. Neither officer acknowledged his pain nor responded to Tesch's or his wife's requests.
 
 B.
 
 8
 After his arrest, Tesch was taken to the Green Lake County Jail. Prior to his arrival, the City of Berlin had informed Green Lake County Deputy Sheriff Sarah Guenther that Tesch was confined to a wheelchair. Deputy Guenther booked Tesch into the jail. Since the Green Lake County Jail was not equipped to house a disabled inmate, Deputy Guenther attempted to make arrangements to relocate Tesch to a facility equipped to detain disabled individuals. After contacting several local departments that were unable to assist, Deputy Guenther called Berlin Memorial Hospital. The hospital agreed to house Tesch in one of its rooms. Tesch stayed at the hospital under guard until the morning of November 14, 1992.
 
 
 9
 On November 14, 1992, another deputy contacted the Outagamie County Jail to determine whether it had the capability to hold Tesch. That deputy advised Outagamie County that Tesch was in a wheelchair and needed bathroom facilities for the disabled. The jail agreed to accept Tesch, and a Green Lake County deputy sheriff transported Tesch that afternoon. Sergeant Mary Effertz of the Outagamie County Sheriff's Department was the shift supervisor and officer in charge when Tesch was admitted and booked into the jail. Effertz made the decision to accept Tesch.
 
 
 10
 Tesch arrived at the jail in his manual wheelchair. The booking officer at the jail completed an inmate medical receiving/screening form for Tesch, which indicated that he had muscular dystrophy and was in a wheelchair. Tesch claimed that he was unable to care for himself and could not change into the jail-issued clothing he was given. The booking officer and a Green Lake County deputy sheriff helped him put on the jail-issued shirt. According to Tesch, the officers refused to help him change into his jail-issued pants, and he was required to wear the same pants for the forty-four hours he spent at the jail. Tesch claims that Sergeant Effertz affirmed the decision to deny him the jail-issued pants.
 
 
 11
 At the time of Tesch's arrival, the Outagamie County Jail was less than a year old with some cells specifically designed for the incarceration of disabled individuals. Tesch's cell was designed to meet all the applicable codes governing accessibility for disabled individuals which were in effect during the design and construction of the jail. The Wisconsin Department of Corrections and the Wisconsin Department of Industry, Labor, and Human Relations approved the design of the jail. The cell in which Tesch was housed contained a bed, toilet, and sink specifically designed to be accessible to disabled prisoners.
 
 
 12
 The sink and toilet were part of one unit built into the wall with a clearance designed for wheelchairs, and the toilet was higher than an ordinary toilet to facilitate transfer from a wheelchair. The sink and toilet unit also included a support railing to assist disabled prisoners in transferring between their wheelchairs and the toilet. The bed, which was permanently affixed to the floor, consisted of a steel platform on steel legs with a removable mattress on top. It was positioned in the cell to provide maximum clearance for wheelchairs. There were no grab bars installed by the bed.
 
 
 13
 The shower stall for Tesch's cell was designed to be wide enough to permit the entry of a wheelchair. The shower stall did not have grab bars. Outagamie County did have a shower wheelchair available for the use of disabled inmates. Tesch did not inquire about taking a shower and was not aware of this wheelchair, and the jail employees did not advise him of it. Tesch did not shower during his forty-four hours of confinement in the Outagamie County Jail. Normally, he took a shower once a week; he had showered two days before he was arrested.
 
 
 14
 Even though the cell was specifically designed for disabled inmates, Tesch stated that he struggled to use its facilities. He said he found it difficult and exhausting to use the toilet in his cell because it had only one grab bar and because of its height in relation to his wheelchair. Tesch claimed that due to his exhaustion from his efforts in accessing the toilet, the only way that he could use the toilet to urinate was to set his wheelchair in front of the toilet and arch his urine stream while he remained seated in the wheelchair.
 
 
 15
 Tesch says that he was able to use the sink in his cell to wash his face and hands but was unable to drink from it because it was too high for his wheelchair. Tesch requested assistance in obtaining a drink of water and in washing his face. A correctional officer gave him a washcloth for his face but did not provide any further assistance. Thus, Tesch asserts that he received nothing to drink other than the beverage provided with his three meals each day.
 
 
 16
 Finally, Tesch claims that he was unable to get into the bed without assistance because of its height and lack of grab bars. On the evening of November 14, 1992, Tesch informed a correctional officer that he was unable to get into the bed without assistance and asked for help. The officer refused to lift Tesch. He advised Tesch that Green Lake County said that he could care for himself. The officer also told him that he was going to call Green Lake County and tell them to retrieve Tesch.
 
 
 17
 Approximately an hour or two later, Tesch asserts that he asked two officers for assistance in getting into bed. Tesch claims that they laughed and said he was a big boy who could take care of himself. Sergeant John Behrent of the Outagamie County Sheriff's Department was the shift supervisor assigned to the jail working the 3:00 p.m. to 11:00 p.m. shift on November 11 and 12, 1992. Sergeant Behrent knew that there was no rail to assist Tesch in getting into bed. He also learned that Tesch was unable to get into bed without assistance. He did not recall either providing assistance to Tesch or requesting that other jail personnel assist Tesch in getting into bed.
 
 
 18
 Because he was unable to get into bed, Tesch pulled the mattress from the bed onto the floor. He then dropped from his wheelchair onto the mattress. He slept on the mattress on the floor both nights that he was confined at the jail. To get up from the mattress, Tesch had to drag himself to his wheelchair and try to pull himself into it. This process was very exhausting, and Tesch was only able to get into his wheelchair in this manner on the first morning of his detention. On the second morning, Tesch had two correctional officers assist him into his wheelchair. As a result of his inability to return to his wheelchair, Tesch was unable to use the toilet during the night. Tesch testified in his deposition, however, that he was able to delay his use of the toilet until the morning when he was in his wheelchair.
 
 C.
 
 19
 Tesch brought this action pursuant to 42 U.S.C. § 1983 against three different groups of officials and municipalities: (1) the City of Berlin, Chief of Police John W. Dobson, Sergeant Trochinski, Officer Trochinski, and Officer Zache, (2) the County of Green Lake and Sheriff Don Bruendl, and (3) the County of Outagamie, Sheriff Bradley G. Gehring, Sergeant Behrent, Sergeant Effertz, and certain unnamed deputy sheriffs and/or correctional officers employed by Outagamie County.
 
 
 20
 Against the City of Berlin officers, Tesch charged that his arrest was an unreasonable seizure under the Fourth Amendment, that the officers used excessive force in violation of the Fourth Amendment, and that they placed him in danger in violation of the Due Process Clause of the Fourteenth Amendment. Tesch also alleged that Chief Dobson was liable for failing to train his officers on the transportation of disabled individuals and that the City of Berlin was liable for failing to implement its policy on the transportation of disabled individuals. On October 17, 1997, the district court granted summary judgment for the City of Berlin, Chief Dobson, and its officers, holding that Tesch's arrest did not violate any of his constitutional rights and that no municipal liability can exist when there is no constitutional deprivation. See Tesch v. County of Green Lake, No. 93-C-827, slip op. at 4, 7-16 (E.D.Wis. Oct. 17, 1997).
 
 
 21
 Against the Outagamie County officers, Tesch claimed that they violated his right to reasonable medical care in violation of the Due Process Clause of the Fourteenth Amendment, his right to avoid punishment without due process under the Fourteenth Amendment, his right to equal protection under the Fourteenth Amendment, and his right of access to public facilities under the Americans with Disabilities Act. Tesch also alleged that Chief Gehring and Outagamie County were liable because, as a matter of policy and practice, they acted with deliberate indifference in failing to discipline, train, or otherwise direct their employees concerning the rights of disabled individuals. The district court granted summary judgment for Outagamie County, its officers, and Chief Gehring, holding that the officers did not violate any of Tesch's constitutional or statutory rights and that Tesch presented no evidence to establish that Outagamie County's failure to train the officers caused his injuries. See id. at 5, 22-24.
 
 
 22
 Finally, Tesch sued the County of Green Lake and Sheriff Bruendl, contending that their failure to adopt any policy for incarceration of disabled individuals led to his treatment at the Outagamie County Jail. The district court granted the defendants' motion for summary judgment, holding that Tesch did not demonstrate that the failure to have a policy resulted in any harm to him or that the frequency with which disabled individuals are potentially subject to incarceration in Green Lake County is sufficiently large that the need for a policy is obvious. See id. at 19.
 
 II. ANALYSIS
 
 23
 Tesch brings two claims. First, Tesch contends that the City of Berlin and its officers violated the Due Process Clause of the Fourteenth Amendment in the manner of his arrest. Second, he claims that Outagamie County and its officers violated the Due Process Clause by failing to provide for his basic human needs during his pretrial detention.
 
 A. Summary Judgment Standard
 
 24
 We review a district court's grant of summary judgment de novo, drawing our own conclusions of law and fact from the record before us. See Chiaramonte v. Fashion Bed Group, Inc., 129 F.3d 391, 395 (7th Cir.1997). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, neither "the mere existence of some alleged factual dispute between the parties," Anderson, 477 U.S. at 247, 106 S.Ct. 2505, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), is sufficient to defeat a motion for summary judgment.
 
 B. Treatment During Arrest
 
 25
 Tesch challenges whether the City of Berlin defendants unnecessarily exposed him to danger during his arrest in violation of his right to substantive due process. A series of Supreme Court cases, however, forecloses Tesch's substantive due process claim. In Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court addressed the claims of a diabetic who brought a § 1983 action to recover damages for injuries allegedly sustained when law enforcement officers used physical force during an investigatory stop. See id. at 388, 109 S.Ct. 1865. Graham alleged that the officers used excessive force in violation of his right to substantive due process under the Fourteenth Amendment. See id. at 390, 109 S.Ct. 1865. The Court rejected Graham's attempt to recover damages under the Fourteenth Amendment's Due Process Clause, holding that
 
 
 26
 all claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.
 
 
 27
 Id. at 395, 109 S.Ct. 1865; see also Albright v. Oliver, 510 U.S. 266, 273-74, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality).
 
 
 28
 Last term in United States v. Lanier, 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), the Court confirmed that the rule stated in Graham "requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." Id. 117 S.Ct. at 1228 n. 7. Thus, Tesch cannot use a substantive due process claim to circumvent the standards appropriate under the Fourth Amendment if his claim is "covered by" the Fourth Amendment. See id.; see also County of Sacramento v. Lewis, --- U.S. ----, 118 S.Ct. 1708, 1715, 140 L.Ed.2d 1043 (1998) (finding substantive due process analysis appropriate because a police pursuit that attempts to seize a person does not amount to a "seizure" within the meaning of the Fourth Amendment).
 
 
 29
 The Fourth Amendment ensures that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." A Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied," Brower v. County of Inyo, 489 U.S. 593, 597, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), such that "a reasonable person would have believed that he was not free to leave," United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Tesch was informed he was under arrest, ordered to maneuver his scooter to a waiting squad car, and was told to get in the vehicle. There is no doubt that the police officers seized him. His arrest is a textbook example of a Fourth Amendment seizure. See 3 Wayne R. LaFave, Search and Seizure 3 (1996).
 
 
 30
 Though Tesch characterizes his claim as a due process violation for unnecessarily exposing him to danger, it is more appropriately viewed as either a claim for excessive force in an arrest or a general claim against an unreasonable seizure. Because the Fourth Amendment addresses the right of the people to be free of unreasonable seizures and excessive force in the course of an arrest, Graham's more-specific provision rule precludes this portion of Tesch's appeal. Tesch cannot use substantive due process to backdoor the district court's conclusion that his arrest satisfies the Fourth Amendment's reasonableness standard. See Albright, 510 U.S. at 274-75, 114 S.Ct. 807 (requiring plaintiff to raise right to be free from prosecution without probable cause under Fourth Amendment and rejecting substantive due process claim); Winfield v. Bass, 106 F.3d 525, 530 n. 2 (4th Cir.1997) (refusing to address substantive due process claim when the Cruel and Unusual Punishment Clause of the Eighth Amendment is applicable); Patel v. Penman, 103 F.3d 868, 874-75 (9th Cir.1996) (holding that Takings Clause of the Fifth Amendment preempts a substantive due process claim); Tinney v. Shores, 77 F.3d 378, 381 (11th Cir.1996) (holding that Fourth Amendment forecloses due process claim); Johnson v. Phelan, 69 F.3d 144, 146 (7th Cir.1995) (same). Because the district court has already addressed Tesch's Fourth Amendment claims based on the manner of his arrest and because Tesch has elected not to appeal those determinations, we reject his attempt to circumvent that decision by appealing his substantive due process claim based on the same events.
 
 C. Conditions of Confinement
 
 31
 Tesch also claims that the conditions of his confinement at the Outagamie County Jail violated substantive due process. Tesch is correct that the State owes pretrial detainees an affirmative duty to provide basic necessities.
 
 
 32
 [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs--e.g., food, clothing, shelter, medical care, and reasonable safety--it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.
 
 
 33
 DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (citations omitted). Tesch contends that the Outagamie County defendants did not satisfy their duty to ensure that his basic human needs were met.
 
 
 34
 The fact that Tesch is a pretrial detainee is critical in determining the source of his constitutional protections. Unlike convicted prisoners whose constitutional protections are primarily based in the Eighth Amendment's prohibition on cruel and unusual punishment,[1] see Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), state pretrial detainees are protected under the Due Process Clause of the Fourteenth Amendment, see Bell v. Wolfish, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The Due Process Clause protects pretrial detainees by prohibiting the State from punishing them. See Bell, 441 U.S. at 535 n. 16, 99 S.Ct. 1861; Antonelli v. Sheahan, 81 F.3d 1422, 1427 (7th Cir.1996); Salazar v. City of Chicago, 940 F.2d 233, 239-240 (7th Cir.1991). These protections are "at least as great as the Eighth Amendment protections available to a convicted prisoner." City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); see also Mathis v. Fairman, 120 F.3d 88, 91 n. 3 (7th Cir.1997); Hall v. Ryan, 957 F.2d 402, 404 (7th Cir.1992).
 
 
 35
 To demonstrate a constitutional violation for the conditions of his confinement, Tesch must prove both the objective component of his substantive due process claim (Did the conditions amount to punishment?) and the subjective or state of mind component (Did the officials act with a sufficiently culpable state of mind?). See Armstrong v. Squadrito, 152 F.3d 564, 570 (7th Cir.1998); Wilson v. Williams, 83 F.3d 870, 875 (7th Cir.1996) (reasoning that the search for punishment cannot be wholly objective); Duckworth v. Franzen, 780 F.2d 645, 652 (7th Cir.1985) (reasoning that punishment, in its normal meaning, implies intent; it is "a deliberate act intended to chastise or deter"); cf. Wilson v. Seiter, 501 U.S. 294, 298-302, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (concluding intent requirement is implicit in the word punishment in its analysis of Eighth Amendment claim).
 
 
 36
 The district court granted summary judgment for all of the Outagamie County defendants, concluding that Tesch was not punished because none of the conditions he experienced was unrelated to the goals of confinement and that the jail officials did not act with criminal recklessness. Tesch contends that the district court erred because he established a due process claim by demonstrating that his conditions of confinement denied him basic human necessities and that the Outagamie County defendants did not justify these conditions as incidental to the security or management of the jail. Because some confusion exists among the parties over the appropriate standard to use in analyzing the state of mind element for claims like Tesch's under the Due Process Clause of the Fourteenth Amendment, we pause to address this question before examining whether the district court erred in granting summary judgment for the Outagamie County defendants.
 
 1.
 
 37
 In Bell v. Wolfish, the Supreme Court considered for the first time the scope of constitutional protection that the Due Process Clause affords pretrial detainees. 441 U.S. at 520, 99 S.Ct. 1861. In a class action complaint, the detainees challenged overcrowded conditions, undue lengths of confinement, improper searches, inadequate recreational, educational, and employment opportunities, insufficient staff, and objectionable restrictions on the purchase and receipt of personal items and books. See id. at 527, 99 S.Ct. 1861. Each of these claims were based on a general restriction or practice of the New York detention facility. See id. at 523, 535-36, 99 S.Ct. 1861.
 
 
 38
 In addressing these challenges, the Supreme Court outlined the principles that courts should use in determining the constitutionality of conditions of pretrial detention. Specifically, it stated that "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." Id. at 538, 99 S.Ct. 1861. Absent a showing of intent to punish, the Court noted that this determination "generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it.]' " Id. (quoting Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)). Thus, the Court concluded:
 
 
 39
 [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal--if it is arbitrary or purposeless--a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.
 
 
 40
 Id. at 539, 99 S.Ct. 1861.
 
 
 41
 Subsequently, the Supreme Court and this Court have applied the Bell test to analyze constitutional attacks on the general practices, rules, and restrictions of pretrial confinement. See United States v. Salerno, 481 U.S. 739, 746-47, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (holding Bail Reform Act's authorization of pretrial detention constitutional); Block v. Rutherford, 468 U.S. 576, 588-91, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) (holding policy of no contact visits and random shakedown searches of cells in absence of detainees constitutional); Zarnes v. Rhodes, 64 F.3d 285, 290-91 (7th Cir.1995) (holding placement in segregation after inmate argument constitutional); Martin v. Tyson, 845 F.2d 1451, 1456-58 (7th Cir.1988) (holding opening of mail and monitoring of phone call constitutional).
 
 
 42
 However, a second line of cases exists which establishes a different state of mind standard from the Bell test when the State denies a pretrial detainee his basic human necessities. Since Archie v. City of Racine, 847 F.2d 1211, 1218-19 (7th Cir.1988) (en banc), we have required plaintiffs to establish that officials acted intentionally or in a criminally reckless manner[2] in order to sustain a substantive due process claim for their specific acts or failures to act. Under the alternative description "deliberate indifference," we have required plaintiffs to establish that a jail official acted with this level of intent in relation to a pretrial detainee's need for medical care, see Murphy v. Walker, 51 F.3d 714, 717 (7th Cir.1995); Salazar, 940 F.2d at 238, risk of suicide, see Estate of Cole v. Fromm, 94 F.3d 254, 259 (7th Cir.1996), risk of harm from other inmates, see Zarnes, 64 F.3d at 290, and need for food and shelter, see Antonelli, 81 F.3d at 1432-33.
 
 
 43
 Thus, before we evaluate the district court's decision, we must determine whether the Bell test or the deliberate indifference standard applies when a disabled pretrial detainee alleges that jail officials punished him by placing him in a cell that has been modified to accommodate disabled inmates but does not satisfy his particular basic human needs.
 
 2.
 
 44
 Following the Supreme Court's lead in Wilson v. Seiter, we believe that deliberate indifference is the appropriate standard. In Wilson, the Court determined what state of mind applies in Eighth Amendment cases challenging prison conditions.[3] See 501 U.S. at 302, 111 S.Ct. 2321. In deciding between a standard of acting " 'maliciously and sadistically for the very purpose of causing harm,' " Whitley v. Albers, 475 U.S. 312, 320-21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.1973)), and a standard of deliberate indifference, the Court reasoned that the state of mind standard should depend "upon the constraints facing the official. From that standpoint, [it saw] no significant distinction between claims alleging inadequate medical care and those alleging inadequate 'conditions of confinement.' " Wilson, 501 U.S. at 303, 111 S.Ct. 2321. The Court continued this line of reasoning, stating that medical care is just as much a condition of confinement as "the food he is fed, the clothes he is issued, the temperature he is subjected to in his cell, and the protection he is afforded against other inmates." Id. Thus, " '[w]hether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend his medical needs, or a combination of both, it is appropriate to apply the "deliberate indifference" standard articulated in Estelle.' " Id. (quoting LaFaut v. Smith, 834 F.2d 389, 391-92 (4th Cir.1987) (Powell, J.)). Given that we have already decided that deliberate indifference is the appropriate standard for substantive due process claims for a failure to attend to pretrial detainee's medical needs, threat of suicide, threat of harm from other inmates, and need for food and shelter, we believe that deliberate indifference is the appropriate standard for Tesch's claims.
 
 
 45
 In contrast, the Bell test fits Tesch's claims poorly. The Bell test works well to assess constitutional attacks on general practices, rules, and restrictions of pretrial confinement when the jail official's state of mind is not a disputed issue. See Hare v. City of Corinth, 74 F.3d 633, 644 (5th Cir.1996) (en banc). When the State imposes a general practice, rule, or restriction of pretrial confinement, it manifests its intent to subject all pretrial detainees to that practice, rule, or restriction. Similarly, even in situations in which the State does not mean to deny basic human necessities, we infer the State's intent when the restriction and its effect on pretrial detainees are known and the State imposes the restriction on pretrial detainees anyway. See id.; see generally Shobe, 93 F.3d at 421; Wilson, 83 F.3d at 875. Thus, an appropriate Bell test case "starts with the assumption that the State intended to cause the pretrial detainee's alleged constitutional deprivation." Hare, 74 F.3d at 644-45.
 
 
 46
 Here, we cannot assume that the State intended to cause Tesch's alleged constitutional deprivation. It is not obvious that a jail official would know that a cell for disabled inmates may not be able to accommodate this incoming detainee. There is no indication that jail officials knew beforehand that placing Tesch in this cell would deprive him of any basic human necessities. Tesch cannot blithely pass over his obligation to establish that the jail officials acted with the requisite intent in placing him in the cell and failing to respond to his requests for assistance. Just like a pretrial detainee who claims a failure to provide medical care or protect from violence, Tesch must establish that the jail officials had the intent to punish or acted in a criminally reckless manner. See Zarnes, 64 F.3d at 290; Salazar, 940 F.2d at 239. Thus, Tesch must establish that the jail officials acted with deliberate indifference to their duty to provide for his basic human needs.
 
 3.
 
 47
 Turning to whether Tesch satisfied the standard of deliberate indifference, we find that the district court was correct in granting summary judgment to the Outagamie County defendants. While Tesch states a litany of conditions at the Outagamie County Jail that he believes violated his right to substantive due process, we can categorize his claims in two groups: claims based only on his placement in the cell (limited access to the sink and toilet; no access to a shower) and claims based on his placement in the cell or treatment in the jail and a jail officer's refusal to assist him (no change of clothes; beverages only with meals; sleeping on his mattress on the floor instead of the bed).
 
 
 48
 There is no doubt that Tesch cannot satisfy the deliberate indifference standard for any of the claims based only on his placement in the cell designed to accommodate inmates confined to a wheelchair. Deliberate indifference means recklessness in a criminal or subjective sense. See Farmer v. Brennan, 511 U.S. 825, 838, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); Miller v. Neathery, 52 F.3d 634, 638 (7th Cir.1995). "Under the subjective standard, it is not enough to show that a state actor should have known of the danger his actions created. Rather, a plaintiff must demonstrate that the defendant had actual knowledge of impending harm which he consciously refused to prevent." Hill, 93 F.3d at 421; see also Duckworth, 780 F.2d at 652 (stating deliberate indifference as "an act so dangerous that the defendant's knowledge of the risk can be inferred"). Tesch has presented no evidence that would allow us to infer that the jail officers knew that placing Tesch in that cell would cause him harm. Though he had limited access to the toilet and sink and no access to the shower, he did not raise these problems to the attention of his jailers. These limited access problems would not have been obvious to a jail officer before Tesch was placed in the cell. Whether the officers acted negligently by assuming that one cell can accommodate all inmates confined to a wheelchair is debatable, but negligent acts are not enough to state a due process claim. See Daniels v. Williams, 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (holding that negligent conduct does not constitute a Fourteenth Amendment deprivation); see also Davidson v. Cannon, 474 U.S. 344, 347-48, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) (same). Because Tesch has not provided us with evidence that his placement in the cell was an act so dangerous that we can infer the officers' knowledge of the ensuing risks, he did not establish a question of material fact on whether the officers acted with deliberate indifference to his basic human needs. The district court did not err in granting the officers summary judgment on this group of claims.
 
 
 49
 As for the second group of claims, Tesch's requests for assistance in putting on his jail-issued pants, obtaining drinking water from the sink, and getting into the bed in his cell were sufficient to provide the jail officers with actual knowledge of any impending harm if he did not receive assistance. To establish a substantive due process violation, though, Tesch must also show that these impositions are sufficiently serious. As the Supreme Court has stressed, "[t]here is, of course[,] a de minimis level of imposition with which the Constitution is not concerned." Ingraham, 430 U.S. at 674, 97 S.Ct. 1401.
 
 
 50
 In determining whether an imposition is de minimis, it is appropriate to evaluate both its severity and its duration. See Dixon v. Godinez, 114 F.3d 640, 643 (7th Cir.1997) (evaluating both factors in an Eighth Amendment claim for the conditions of confinement). For the forty-four hours that Tesch was held in the Outagamie County Jail, these impositions are not sufficiently severe to amount to a form of punishment. See Antonelli, 81 F.3d at 1430 (concluding that sleeping on the floor without a mattress for one night is not punishment of detainees); Powell v. Cook County Jail, 814 F.Supp. 757, 759 (N.D.Ill.1993) (holding that the Constitution is indifferent as to whether the mattress is on the floor or on the bed). In this second set of claims, Tesch was not denied any of his basic human necessities; he just did not receive the level of comfort that he demanded. Correctional officials are not required to provide comfortable jails, even for pretrial detainees. These short-term impositions are simply part of the general level of discomfort anyone can expect to experience while in custody. Because there are more inmates than jailers at every facility, it is impossible for a prisoner or a pretrial detainee to expect an immediate response from jail officials for every request made. Though it is possible that these impositions may rise to the level of a constitutional violation if they lasted for six months or a year, it is not unreasonable for a pretrial detainee to expect to experience a short-term imposition on a basic human necessity. Thus, we do not believe that requiring Tesch to wear the same clothes, or receive beverages only with meals, or sleep on his mattress on the floor for less than two full days rises to the level of severity necessary to state a constitutional violation. See Bell, 441 U.S. at 534, 99 S.Ct. 1861.D.
 
 
 51
 Having decided that correctional officers at the Outagamie County Jail did not violate the Constitution, we must conclude that Outagamie County, Chief Gehring, and Sergeants Behrent and Effertz[4] cannot be held liable for Tesch's damages. See Estate of Phillips v. City of Milwaukee, 123 F.3d 586, 596-97 (7th Cir.1997); Thompson v. Boggs, 33 F.3d 847, 859 (7th Cir.1994). Tesch sued these parties because he thought they were legally responsible for the actions of the correctional officers. Because the officers did not inflict a constitutional injury on Tesch, the County, Chief, and the Sergeants cannot be liable to Tesch. See City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam). A failure to train theory or a failure to institute a municipal policy theory requires a finding that the individual officers are liable on the underlying substantive claim. See id.; Phillips, 123 F.3d at 597; Thompson, 33 F.3d at 859; Gibson v. City of Chicago, 910 F.2d 1510, 1522 (7th Cir.1990). The district court did not err in granting these defendants summary judgment for any supervisory or municipal liability.
 
 III. CONCLUSION
 
 52
 Because Tesch cannot use his substantive due process claim against the City of Berlin defendants to circumvent the district court's determination that his arrest was reasonable and because Tesch did not establish that any of the conditions of his confinement at the Outagamie County Jail violated his substantive due process protections, we A FFIRM the judgment of the district court.
 
 
 
 *
 Oral arguments were scheduled to be heard in this case on May 22, 1998. On May 20, 1998, however, we granted a motion that they be waived. The appeal, therefore, was submitted on the briefs and record. See Fed. R.App. P. 34(a), (f); 7th Cir. R. 34(e)
 
 
 [1]
 The Eighth Amendment applies "only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.... [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." Ingraham v. Wright, 430 U.S. 651, 671-72 n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (citations omitted)
 
 
 [2]
 While the Supreme Court has recently suggested that the tort standard of recklessness is enough to establish municipal liability in § 1983 cases, see Board of County Comm'rs v. Brown, 520 U.S. 397, 117 S.Ct. 1382, 1391, 137 L.Ed.2d 626 (1997), this standard of culpability does not affect our analysis at this stage. Our question is what state of mind is required to establish the alleged underlying constitutional violation of due process. See Canton v. Harris, 489 U.S. 378, 388-89, n. 2, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); West v. Waymire, 114 F.3d 646, 651 (7th Cir.1997), cert. denied, --- U.S. ----, 118 S.Ct. 337, 139 L.Ed.2d 261 (1997)
 
 
 [3]
 Although Wilson is an Eighth Amendment case, we do not see how that distinction makes a difference for this question. While the objective component of a claim under the Due Process Clause of the Fourteenth Amendment and a claim under the Eighth Amendment may be different (a question we do not need to answer at this time), we have applied the same state of mind requirement under both provisions. Compare Estelle, 429 U.S. at 106, 97 S.Ct. 285 (requiring a prisoner to allege deliberate indifference) with Hill v. Shobe, 93 F.3d 418, 421 (7th Cir.1996) (requiring a pretrial detainee to allege deliberate indifference)
 
 
 [4]
 Though Tesch sued Sergeants Effertz and Behrent as both actors and supervisors, we address only their liability as supervisors in this section. In the previous section, we held that none of the correctional officers at the jail violated the Tesch's right to substantive due process. In doing so, we considered Tesch's claims against both sergeants